Hillsborough,  }
Dec. 5, 1944.  } No. 3495.

### STEPHEN CONNELL *v.* STATE OIL COMPANY.

*Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Louis E. Wyman* orally), for the plaintiff.

*Thorp & Branch (Mr. Branch* orally), for the defendant.

PAGE, J.  The defendant maintained on its premises a pit, over which automobiles were run for service and repair work.  In the course of the work, as the defendant had notice, more or less gasoline was spilled into the pit.  For the purpose of freeing the pit of fluid, principally water, the defendant had a sump pump operated by an electric motor.  The pumping mechanism rested in the sump hole, and the motor was about two feet above the floor of the pit. The whole contrivance was longer than the depth of the pit.  It did not stand straight, but "laid in different positions . . . against the wall, hanging over the side . . . on the wall or the side of the hole." Power to operate the motor was obtained by plugging an electric cord into one of two or three electric outlets in the side of the pit.

On October 27, 1941, the plaintiff and one or more other employees of the defendant placed over the pit a truck that was discovered to have a broken gasoline line.  In the course of repairs, they had to

remove the broken line and install a new one. The plaintiff could not tell how much gasoline went into the pit during the process. The next morning the plaintiff prepared to clean out the pit. After arranging the hose, he got into the pit and plugged in the cord attached to the motor. As the motor did not start, he gave the motor a push with his hands. Immediately there was an explosion and a fire, and the plaintiff was seriously burned.

From the testimony of the plaintiff's expert witnesses, the jury could reasonably infer that fumes from the gasoline could collect inside of a motor of the type used here, and also that a spark inside the motor might be caused by the brushes of the motor, with a resultant explosion. It appeared that a different type of motor is supplied for such places, known as a non-explosion type, so designed that a spark may not get out or fumes get in. The jury could reasonably find, in the absence of any evidence of some other kind of fire, that the explosion was caused by an interior spark. The care or negligence of the parties depended upon their actual or constructive knowledge of the danger involved. The defendant's general manager testified that he knew that the motor used was not of the non-explosion type and that non-explosion types were made; he also said that he supposed that fumes could not enter the latter. The plaintiff, if his testimony were believed, had no knowledge whatever concerning the danger of fumes in the pit combining with a spark in the interior of the motor actually in use, and as a matter of law he was not chargeable with such knowledge. The case was for the jury.

The plaintiff testified that he had no knowledge as to the danger incident to the use of this pump. Upon cross-examination he was asked, "What do you think you should have been warned about?" The question was excluded, and the defendant excepted. The context shows definitely that the plaintiff could have had no idea concerning the danger prior to the explosion. Assuming that upon later information he might have formed an opinion concerning the matter, the only fact he was competent to testify to was his ignorance. Given his ignorance and the assumed fact of the danger, it was for counsel to argue and the jury to decide whether and in what respect he should have been warned. It was at least discretionary for the Court to exclude the question, whose answer could not aid the jury. An alternative question excluded, "What dangers were there incidental about the use of gasoline about those premises which you were not aware of?" does not stand differently.

The plaintiff's experts were permitted, subject to exceptions, to give testimony concerning certain hypotheses. Among them were (1) the hypothesis that the cord attached to the motor got loose, (2) the hypothesis that the motor knocked against the wall of the pit, (3) the hypothesis that the motor had become defective, rather than that the cause of the explosion was the use of an improperly designed motor, (4) the hypothesis that there was a short circuit, (5) the hypothesis that the bearings of the motor were warm. Not only so, the experts were inclined to assume two or more of these hypotheses in a single answer and in a confusing manner. None of these hypotheses except the third had any support whatever in the evidence, and the fifth was sufficiently rebutted by the fact that it appears that the motor had not been running and could not be hot. When the Presiding Justice permits such testimony over the specific objection of counsel that the hypothesis is unsupported, nothing could be clearer than that the jurors are likely to believe that in the mind of the Court there is evidence to sustain the hypothesis. The only way that undue prejudice can be avoided in such cases is by apt instructions given to the jury.

If *Brito* v. *Company*, 79 N. H. 163, is still to be followed in any case, there is nothing which suggests that the Presiding Justice warned the jury to avoid guessing as applied to the existence of any of these hypotheses. In that respect the present case is distinguishable. *Palmer* v. *Edgerly*, 87 N. H. 391, 396. We cannot, therefore, assume that the verdict was unaffected by the admission of expert testimony based upon nothing except conjecture. If we so assumed we should be guessing that the jurors were not themselves guessing, and declaring fallaciously that we are viewing an edifice of fact.

*New trial.*

BRANCH, J., did not sit: the others concurred.